**Alberta POTTER, Appellant,**

v.

**Otis LaMUNYON, Leslie Davison, Guy T. Parks, Karl Headrick and John Butler, Appellees.**

**No. 8884.**

United States Court of Appeals
Tenth Circuit.

March 1, 1968.

Ted R. Fisher, Tulsa, Okl. (Johnson & Fisher, Tulsa, Okl., with him on brief), for appellant.

Lynn J. Bullis, Jr., Oklahoma City, Okl. (Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., with him on brief) for appellees.

Before WOODBURY,* LEWIS and HICKEY, Circuit Judges.

WOODBURY, Senior Circuit Judge.

This is an action for false arrest and imprisonment brought in the court below under its diversity jurisdiction. Title 28 U.S.C. § 1332(a) (1). The plaintiff, a divorcee and the mother of three small children, is now, and was at the time this action was brought, a citizen of Kansas. The defendants are the Sheriff, his two deputies, a state highway patrol officer and the County Judge, all of Major County, Oklahoma, where the plaintiff's arrest and detention occurred and where she was then living in the county seat of Fairview.

The following facts are not in dispute.

On June 12, 1963, the defendant, La-Munyon, a deputy sheriff, filed a petition with the defendant Butler, sitting legally as judge of the Major County Juvenile Court, alleging that the plaintiff's children were of tender years and dependent and neglected and asking that they be made wards of the court and placed in a suitable home. The court issued summons and notice on the plaintiff who appeared in court on the day set with the children and with retained counsel. The court after hearing found that the chil-dren were indeed dependent and neglected and that the mother was not a suita-ble person to have their care and custody. The court accordingly made the children wards of the court and turned them over to the Child Welfare Division of the State Department of Public Welfare of the State of Oklahoma for placement in a foster home. This was immediately accomplished. The plaintiff at once filed a notice of appeal to the District Court of Major County, where under lo-cal law she would be given a trial *de novo*, by jury if requested.

About a month later on the occasion of her second child's birthday the plaintiff undertook to visit her children at their foster home on a farm seven or eight miles from Fairview. She first telephon-ed the Major County Director of the State Department of Public Welfare for permission. The Director referred her to Judge Butler. Over the telephone Judge Butler told the plaintiff that the children were doing well in their foster home and that she was not to see them. The plain-tiff then consulted over the telephone with the lawyer she had retained to prose-cute her appeal from Judge Butler's cus-tody order, but she did not tell him that Judge Butler had told her to stay away from her children. The lawyer advised the plaintiff that the custody order did not forbid her to see her children and that so far as the order went she could go to see them unless the foster parents objected. The plaintiff next telephoned the foster parents who said they had no objection to her visit. At some time after five o'clock in the afternoon the plaintiff driven by her brother in his automobile set out with her mother to visit her children.

In the meantime Judge Butler had called Deputy Sheriff LaMunyon on the telephone and directed him to go to the foster home and to take the plaintiff in-to custody for contempt of court if she should appear. On his way out of the sheriff's office to accomplish his mission LaMunyon met the defendant Parks, a state highway patrol officer, in his pa-

* Senior Circuit Judge of the First Circuit, sitting by designation.

trol car. LaMunyon told Parks his errand and asked Parks if he knew where the foster home was. Parks said that he did and volunteered to drive LaMunyon out there.

When the plaintiff arrived at the foster home she was met in the dooryard by LaMunyon and Parks. LaMunyon ordered the plaintiff out of her brother's car and into the patrol car and the three set out for Fairview. On the way by prearrangement they met the defendant Headrick, the other deputy sheriff, with his wife in another car. The Headricks took the plaintiff the rest of the way to the jail in Fairview where she was detained for an hour and a half or two hours until the defendant Davison, the Sheriff of Major County, arrived and ordered her release on the advice and recommendation of the County Attorney.[1]

A the close of all the evidence the plaintiff moved for a directed verdict against the defendants jointly and severally on the issue of liability and for submission to the jury only of the issue of her damages. The court denied the motion, denied defendants' motions to dismiss and submitted the case to the jury which returned a verdict for the defendants on which the court entered judgment. The plaintiff seasonably moved to have the verdict and the judgment entered thereon set aside and for a judgment in her favor on the issue of liability and for a new trial to fix her damages. The court below denied the motion and the plaintiff took this appeal.

We affirm.

■ The principle that a judgment will be affirmed on appeal if it may be sustained upon any ground is far too well established to call for citation of authorities. We find ground for sustaining the judgment entered on the verdict for the defendants from which the plaintiff has appealed in the doctrine of judicial immunity.

■ For the soundest reasons of policy it has long been established law that when a judge has general jurisdiction he is not civilly liable for acts done in the exercise of his judicial function. For full discussion see Bradley v. Fisher, 13 Wall. 335, 346 et seq., 20 L.Ed. 646 (1871). But this does not mean that the question of judicial immunity hinges upon the determination of nice questions of jurisdiction for, as the Court pointed out in Bradley v. Fisher, supra, at page 352: "Indeed, some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, or that of the court held by him, or the manner in which the jurisdiction shall be exercised." The distinction to be drawn is between utter and complete lack of jurisdiction and errors in the exercise of a conferred general jurisdiction.

This is the distinction discussed at length and illustrated in Bradley v. Fisher in which a judge who had jurisdiction to disbar was held not civilly liable for disbarring summarily when he should have issued citation on the attorney and given him an opportunity to explain, defend or apologize for his alleged offensive language and conduct. "But," the Court said at page 357, "this erroneous manner in which its jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever over its attorneys."

These principles were adopted long ago in Oklahoma. In Comstock v. Eagleton, 11 Okl. 487, 69 P. 955 (1902), the court held that a judge who had jurisdiction in bastardy was not civilly liable for exceeding his jurisdiction by committing the defendant to jail until he paid costs of prosecution and gave bond guarantee-

1. Viewed realistically it is hard to believe that as much as $10,000 exclusive of interest and costs could be involved in this litigation but federal jurisdiction went unchallenged in the district court.

ing certain other payments. And, the court added at page 496, 69 P. at page 958, " * * * certainly if the judge who rendered the judgment is exempt from liability, the officer who merely issues the process to carry into effect the judgment will be protected." Later in Flint v. Lonsdale, 41 Okl. 448, 139 P. 268 (1914), citing Comstock v. Eagleton, the court held that a justice of the peace with jurisdiction to commit for direct contempt was not civilly liable for doing so although he imposed a more severe punishment than local law allowed for which the plaintiff was later released on *habeas corpus*. In reaching this result the court held that the rule of judicial immunity extended to all judicial officers down to justices of the peace. The further question of the liability of the peace officers who executed the illegal commitment was not presented for, although they were sued with the justice of the peace, the jury returned a verdict for them in the trial court. Later still, in Waugh v. Dibbens, 61 Okl. 221, 160 P. 589, L.R.A.1917B, 360 (1916), the court held that a judge with jurisdiction to commit for contempt was not civilly liable for issuing a defective order of commitment on which the plaintiff was confined but later released on *habeas corpus*. In that case the court reaffirmed its previous holding in Flint v. Lonsdale that protection from civil liability extends to judges of inferior courts or those of limited jurisdiction and it also held that attorneys-at-law in the exercise of their proper functions as such were not liable for their acts "pertinent to the matter in question" if done in good faith. Finally in Quindlen v. Hirschi, Okl., 284 P.2d 723 (1955), the court held that a judge with jurisdiction to commit for insanity was not liable civilly for doing so erroneously by failing to serve legal notice on a 16 year old minor and failing to appoint a guardian *ad litem* to protect her interests.

■ Turning to the case at bar it is clear that Judge Butler had both personal and subject matter jurisdiction in the custody proceeding. It seems equally clear that he erred in the manner in which he exercised his jurisdiction. If the plaintiff was guilty of any contempt of court, a question we need not decide, it certainly was not a direct contempt committed in the presence of the court for which she could be punished summarily. At the most it could only have been an indirect contempt for which under local law she could not be proceeded against without written notice and hearing.[2] Moreover it may be that technically Judge Butler's original jurisdiction terminated with appeal, although his custody order was not thereby suspended. See 10 O.S.A. § 108(2). But however that may be [3] Judge Butler's errors were in the exercise of his jurisdiction and do not alter the fact that he had general jurisdiction in the custody proceeding. And that, as we understand the law of Oklahoma, affords him protection from civil liability.

■ The question of the liability of the officers who carried out Judge Butler's order remains for consideration. No Oklahoma authorities directly in point have been cited to us. We have, however, the statement quoted hereinabove from Comstock v. Eagleton that the officer who merely issues the process to carry an illegal judgment into effect will be protected, and we have the holding in Waugh v. Dibbens that attorneys-at-law in excercising their proper functions are not civilly liable for their acts when done in good faith. These indications of Oklahoma law considered in the light of the obvious confusion in the administration of justice that would follow if

---

2. 21 O.S.A. § 567 "In all cases of indirect contempt the party charged with contempt shall be notified in writing of the accusation and have a reasonable time for defense; and the party so charged shall, upon demand, have a trial by jury."

3. It is unnecessary and it would be inappropriate for us to pass on this question of local law, for Judge Butler revoked his custody order and restored the children to their mother before the appeal could be heard.

peace officers were called upon to review the legality of court orders at the risk of personal liability, lead us to believe that under Oklahoma law officers of the court who do no more than carry out categorical court orders will be protected when, as in this case, they act in good faith without malice or ill will.

Moreover, Patrolman Parks did not arrest the plaintiff or hold her in custody. His role was only the passive one of volunteer chauffeur. And Sheriff Davison was out of town when the plaintiff was arrested and taken to jail, and as soon as he returned he promptly called the County Attorney and on his advice released the plaintiff from custody.

Affirmed.